## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**HARRIS COUNTY, TEXAS,**

*Plaintiff,*

v.

**U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES ("HHS"),**

*and*

**ROBERT F. KENNEDY, JR., SECRETARY OF HHS, IN HIS OFFICAL CAPACITY,**

*Defendants.*

Civ. No. _____

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

---

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
## INTRODUCTION

1.    Plaintiff Harris County ("the County") hereby brings this action against Defendants United States Department of Health and Human Services ("HHS") and Robert F. Kennedy, Jr. in his official capacity as Secretary of HHS (collectively, "HHS," or "Defendants"). The County seeks to enjoin HHS from illegally and arbitrarily ceasing to provide federal grant funding obligated to the County—and effectively causing a de facto cancellation of the refugee resettlement programs mandated by Congress.

2.    Since the end of World War II, Congress has appropriated funds for the resettlement of refugees and other eligible populations. For nearly half a century, Congress has instructed HHS's Office for Refugee Resettlement ("ORR") to administer and distribute those appropriated

funds for refugee resettlement programs that provide eligible individuals with services critical to integration in the United States. *See generally* 8 U.S.C. §§ 1521–24.

3.      Eligible individuals have been specifically granted entry by Congress. They include victims of trafficking and those from countries such as Cuba, Afghanistan, and Ukraine. (ORR collectively uses the term "refugees" to describe these eligible individuals.)

4.      Most recently, in 2022, Congress appropriated over $6.3 billion explicitly for ORR to administer refugee resettlement programs serving these eligible populations.

5.      The County runs one such program. For over forty years, the County has assisted with Congress's stated refugee resettlement objectives by providing essential health screenings, immunizations, and connections to primary care-services annually to 11,000 refugees and other admitted immigrants with documented legal status.

6.      The County's medical refugee resettlement programs are thus especially important for ensuring that vulnerable populations have the medical care necessary to successfully integrate in the community. With the appropriated funds from ORR, the County also protects widespread population health by testing for and preventing communicable diseases, as well as providing over 35,000 immunizations per year. To continue these services, the County was most recently approved to receive over $10.5M in refugee resettlement program grant funding running through fiscal year 2025.

7.      But only a few months after the County was granted that funding, HHS began to unlawfully withhold federal refugee resettlement funds—effectively starving the congressionally-mandated programs. This withholding coincided with the Office of Management and Budget's issuance of a memorandum ("OMB Memorandum") directing HHS to ignore its obligations to disburse federal funds under all grants. On February 25, 2025, the Honorable Judge Loren L.

AliKhan of this Court enjoined HHS from "implementing, giving effect to, or reinstating under a different name" the OMB Memorandum.[1] Despite Judge AliKhan's order, after the issuance of the OMB Memorandum, HHS and ORR began to withhold federal grant funds appropriated for refugee resettlement programs, including those that should flow to the County.

8. The County is not the first to challenge HHS's unlawful attempts to starve the refugee resettlement programs. On February 10, 2025, individual refugee plaintiffs sued multiple defendants, including HHS Secretary Kennedy, in *Pacito v. Trump et al*.[2] On February 28, 2025, the Honorable Jamal N. Whitehead of the Western District of Washington issued a preliminary injunction in that case, determining that plaintiffs had shown a likelihood of success on the merits on their APA claim against Secretary Kennedy. That court agreed that HHS's unlawful *sub silentio* choking off of refugee resettlement program funds was a final agency action reviewable under the APA and that that action was contrary to law and arbitrary and capricious under the APA. Judge Whitehead's order required HHS to release all refugee resettlement program funding for work performed before January 20, 2025.

9. HHS has since released federal grant funds for the County's expenses incurred up to January 19, 2025, likely to comply with Judge Whitehead's order in *Pacito*. But HHS has continued to deprive the County of refugee resettlement program grants for January 20, 2025 onwards—in violation of the APA, the Constitution, and other laws. HHS's unlawful action has resulted in nearly $1.25M of already-appropriated federal grant funding due to the County—a sum that grows every day.

---

[1] Order Granting Preliminary Injunction (ECF No. 25), *Nat'l Council of Nonprofits, et al. v. OMB*, No. 1:25-cv-00239-LLA (D.D.C. Feb. 25, 2025).
[2] Order Issuing Preliminary Injunction (ECF No. 45), *Pacito et al. v. Trump et al.*, No. 2:25-cv-255-JNW (W.D. Wa. filed Feb. 10, 2025).

10.     Most recently, on March 3, 2025, Catholic Charities Fort Worth ("CCFW") filed a complaint for declaratory and injunctive relief from HHS's unlawful blockade of refugee resettlement program funds.[3] CCFW administers the federal grant funding for the non-medical refugee resettlement programs in the Dallas-Fort Worth area of Texas.[4] On March 12, 2025, the Honorable Loren L. AliKhan of this Court heard arguments for a temporary restraining order.

11.     HHS's unlawful behavior has resulted in irreparable harm to the County, and that harm will only continue absent relief. As a result, the County now faces layoffs of its staff, inability to pay rent on clinic leases, increased financial burden and exposure. Through its actions, HHS has effectively caused the devastating shut-down of the County's refugee resettlement program operations. Because of these harms, thousands of eligible individuals and families will lose access to critical services—a frustration of the County's responsibilities and Congress's mandate. In turn, without those critical services, the County's residents and community now face greater risk of disease outbreaks and other threats to their well-being. That community includes the thousands of federally-documented and lawfully-admitted individuals and families that the County serves.

12.     HHS's actions are unlawful on multiple levels. First, HHS's actions contravene appropriations-related statutes and flout the Constitution, including the Article I power of the purse and the Spending Clause. Congress has appropriated specific sums of money for the refugee resettlement programs it created, and those funds must be available until expended. Additionally, Congress has mandated that HHS administer and distribute that funding to ensure the objectives

---

[3] Complaint (ECF No. 1), *Catholic Charities Diocese of Forth Worth, Inc. v. HHS et al.*, No. 1:25-cv-00605-LLA (filed Mar. 3, 2025).

[4] Under the statutory scheme created by Congress, HHS may appoint *replacement designees* to administer the refugee resettlement programs—or aspects of the programs—when the state refuses to do so. 45 C.F.R. §§ 400.8, 400.301. *See infra* ¶¶ 37–38.

of the refugee resettlement program are carried out. *See* 8 U.S.C. § 1522(a). HHS cannot refuse that congressional mandate.

13.      HHS has also failed to satisfy any provision of the Impoundment Control Act, which provides specific requirements governing executive-branch attempts to delay appropriated funding. Because HHS has not satisfied any Impoundment Control Act requirements, its refusal to distribute appropriated funds violates its statutory authority. 2 U.S.C. § 684.

14.      HHS's actions are also arbitrary and capricious under the APA. 5 U.S.C. §§ 701–06. HHS has offered no explanation, rational or otherwise, for its decision to effectively shut down the time-sensitive, urgent, and essential refugee resettlement program services. Instead, HHS has effectively refused to communicate with the County, despite the obvious, irreparable, and devastating consequences on the County's refugee resettlement programs. HHS does so in violation of Congress's command to ensure that the refugee resettlement program ensure that eligible individuals integrate "as quickly as possible." 8 U.S.C. § 1522(a)(1)(A).

15.      Finally, HHS's actions cannot be supported by any Executive Order purporting to limit immigration. No executive order could *ever* justify the executive branch's violation of constitutional separation of powers here. Even further, none of the President's Executive Orders related to immigration apply to the refugee resettlement programs and the County's services funded under those programs. Instead, Congress has dictated that the funding at issue here may only support documented, previously-admitted individuals already located in the United States. *See* 8 U.S.C. § 1522(a)(3); 45 C.F.R. § 400.43(a).

16.      Accordingly, the County requests that this Court enjoin—temporarily, preliminarily, and permanently—HHS's refusal to release to the County any of the refugee resettlement program funding that was appropriated by Congress for the period from January 20,

2025 onwards. The County further requests that this Court declare that HHS's actions regarding the refugee resettlement programs, as applied to the County, as arbitrary and capricious under the Administrative Procedure Act ("APA").

## JURISDICTION AND VENUE

17.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, and the judicial review provisions of the Administrative Procedure Act ("APA").

18.    The APA waives sovereign immunity where, as here, federal agencies have acted in a manner that is arbitrary and capricious, an abuse of discretion, or otherwise in violation of law. 5 U.S.C. § 706(2)(A).

19.    This Court has authority to issue a declaratory judgment under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, 2202, and Federal Rule of Civil Procedure 57.

20.    This Court has authority to grant injunctive relief under 5 U.S.C. §§ 702, 706, and Federal Rule of Civil Procedure 65.

21.    Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(b)(2) and (e)(1). Defendant HHS is a United States agency sued in its official capacity and headquartered in Washington, D.C. Defendant Secretary Kennedy is sued in his official capacity and maintains his principal office in Washington, D.C. On information and belief, a substantial part of the events giving rise to this Complaint occurred and continue to occur within the District of D.C., including Defendants' decisions regarding the refugee resettlement program grants at issue in this suit.

## PARTIES

22.    Plaintiff Harris County, Texas ("the County") is a political subdivision of the State of Texas.

23.    The County receives funding from Defendant U.S. Department of Health and Human Services ("HHS") to operate services through the congressionally-mandated refugee resettlement program. More specifically, the County provides medical services to government-approved, legally-admitted refugees and other individuals falling under categories specified by Congress. In particular, the County provides these individuals with required initial health screenings, vaccinations, infectious disease screening, and necessary referrals to other providers.

24.    HHS is an agency of the Government of the United States under 5 U.S.C. § 701(b)(1). As mandated by Congress, HHS houses the Office of Refugee Resettlement ("ORR"). Congress has instructed ORR to administer and distribute funding appropriated for the refugee resettlement program. As a result, HHS's required duties include the processing and distribution of the refugee resettlement program grants that flow down to the County.

25.    Defendant Robert F. Kennedy, Jr. is the Secretary of HHS and is sued in his official capacity. He is responsible for the administration of funds appropriated to ORR, through HHS.

## STATUTORY AND REGULATORY BACKGROUND

**A. Congress requires HHS to fund and administer the refugee resettlement program services.**

26.    Nearly half a century ago, Congress enacted the Refugee Act of 1980 to uphold "the historic policy of the United States to respond to the urgent needs of persons subject to persecution in their homelands." Pub. L. 96-212, title I, § 101, 94 Stat. 102 (March 17, 1980). Congress explained that the "objectives of this Act are to provide a permanent and systematic procedure for the admission to this country of refugees of special humanitarian concern to the United States, and to provide comprehensive and uniform provisions for the effective resettlement and absorption of those refugees who are admitted." *Id.*

27.    To accomplish those objectives, Congress created the Office of Refugee Resettlement ("ORR") within HHS. 8 U.S.C. § 1521. Congress explicitly stated that ORR's function is "to fund and administer" the refugee resettlement programs. *Id.*

28.    Congress further mandated that ORR "shall, to the extent of available appropriations," make refugee resettlement program resources available "as quickly as possible" to achieve Congress's resettlement goals. *See* 8 U.S.C. § 1552(a)(1)(A).

29.    The statutory scheme envisions that HHS will meet this obligation by distributing grants. *Id.* § 1522(a)–(d); *see also id.* § 1522(b)(7)(D) (requiring each refugee resettlement program grant to require the recipient to "fulfill its responsibility to provide for the basic needs . . . of each refugee resettled and to develop and implement a resettlement plan . . . and to monitor the implementation of such plan").

30.    The statute makes clear the extent of the obligations that Congress placed upon ORR, including requiring ORR to consult with localities on resettlement policies and strategies. *E.g.*, 8 U.S.C. § 1522(a)(2)(A)–(B). In addition, Congress prohibited ORR from delegating to a state its duties to review or approve refugee resettlement program grants. *Id.* § 1522(a)(4)(C).

31.    Finally, Congress authorized the Secretary of HHS to issue regulations to carry out the objectives of the refugee resettlement programs, including grants and contracts for funding. 8 U.S.C. § 1522(a)(9); *see generally id.* 1522(b)–(e).

32.    Consistent with the objectives outlined by Congress, ORR's refugee resettlement programs assist individuals only after their admission to the United States. In other words, although ORR generally uses the term "refugees," individuals only qualify for ORR's refugee resettlement programs after ***obtaining documented, legal immigration or parolee status from the federal government***. 8 U.S.C. § 1522(a)(3); *see also* 45 C.F.R. § 400.43(a) (stating an applicant seeking

assistance from the refugee resettlement programs must provide "proof, in the form of documentation issued by the Immigration and Naturalization Service (INS)" of eligible status. *See generally*, ORR, "Fact Sheets: Eligibility and Benefits," HHS, https://acf.gov/orr/programs/refugees/factsheets [https://perma.cc/HTB5-B5S7] (accessed Mar. 11, 2025).

33.    Congress has also continued to reiterate its commitment to the refugee resettlement programs by continuously reauthorizing appropriations for, and expanding the scope of, the refugee resettlement programs. Since 1980, Congress has repeatedly expanded the scope of ORR's services so that seven distinct groups are now available for the refugee resettlement programs:

   a.    In 1980 and 1981, Congress expanded the scope of the refugee resettlement programs to benefit Cuban-Haitian entrants. *See* 8 U.S.C. § 1522 note; Pub. L. 96-422, 94 Stat. 1799, 1810 (Oct. 10, 1980); Pub L. 97-35, 95 Stat. 357, 463 (Aug. 13, 1981).

   b.    In 1988, Congress expanded the scope of refugee resettlement programs to include certain immigrants from Vietnam. *See* 8 U.S.C. § 1101 note.

   c.    In 1988, Congress expanded the scope of refugee resettlement programs to include certain torture survivors. *See* 22 U.S.C. § 2152 note; Torture Victims Relief Act of 1998, Pub L. 105-320, 112 Stat. 3016, 3017–18 (Oct. 30, 1998).

   d.    In 2000 and 2008, Congress expanded the scope of refugee resettlement programs to include victims of human trafficking. *See* 8 U.S.C. § 1232(d)(4)(A); William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008, § 235, Pub. L. 110-457, 122 Stat 5044, 5080 (Dec. 23, 2008); 22 U.S.C. § 7105(b)(1)(A); Victims of Trafficking and Violence Protection Act of 2000, § 107, Pub. L. 106-386, 114 Stat. 1464, 1475 (Oct. 28, 2000).

   e.    In 2008 and in subsequent years, Congress expanded the scope of refugee resettlement programs to include certain immigrants from Iraq. *See* 8 U.S.C. § 1157 note.

   f.    In 2009 and 2021, Congress expanded the scope of refugee resettlement programs to include certain immigrants from Afghanistan. *See* 8 U.S.C. § 1101 note; Extending Government

> Funding and Delivering Emergency Assistance Act, Pub. L. 117-43, div. C, title V, § 2502, 135 Stat. 344, 377 (Sep. 30, 2021); Afghan Allies Protection Act, Pub L. 111-8, 602, 123 Stat. 524, 809 (Mar. 11, 2009).
>
> g.    In 2022, Congress expanded the scope of refugee resettlement programs to include certain immigrants from Ukraine. *See* 8 U.S.C. § 1101 note; Additional Ukraine Supplemental Appropriations Act, Pub L. 117-128, 136 Stat. 1211, 1218 (May 21, 2022).

34.    Congress has reauthorized appropriations for the refugee resettlement programs without controversy—including for the current year. In December 2022, Congress appropriated over $6.3 billion in funding for ORR's refugee resettlement programs, to be available through September 30, 2025. Consolidated Appropriations Act of 2023, Pub. L. 117-328, 136 Stat. 4459, 4870–71, (Dec. 29, 2022). *See also* Pub. L. 117-180, 136 Stat. 2114, 2123 (Sep. 30, 2022) (appropriating nearly $1.8 billion for refugee resettlement programs serving Afghan refugees, to be available through September 30, 2025).

35.    In other words, Congress has unequivocally authorized the refugee resettlement programs. And Congress has thus unequivocally authorized the grants at issue in this suit necessary for the programs' existence—including the grants that flow to the County.

**B. Under its congressionally-authorized regulations, HHS's ORR provides funding for essential refugee resettlement services in the state of Texas, including to Harris County.**

36.    Per Congress's instructions, ORR has implemented regulations governing the distribution of grants under the Refugee Act. 45 C.F.R. §§ 400–02, 410–11; *see also* 8 U.S.C. § 1522(a)(9) (authorizing promulgation of regulations).

37.    Generally, state government agencies agree to assist with the refugee resettlement programs. 45 C.F.R. §§ 400.8, 400.301. But if a state government partially or fully withdraws from administering the refugee resettlement programs, ORR may authorize replacement designees to administer the provision of assistance and services in that state. *Id.* § 400.301.

38.    In 2016, the state of Texas withdrew its government agencies from participation in the refugee resettlement programs. In response, ORR designated the United States Committee for Refugees and Immigrants ("USCRI") as the medical replacement designee across Texas. See ORR, Dear Colleague Letter 17-03 (Mar. 3, 2017), available at https://acf.gov/orr/policy-guidance/texas-replacement-designees [https://perma.cc/ZN24-PYHB] (accessed Mar. 6, 2025). USCRI is an independent nonprofit advocacy and domestic refugee resettlement organization.

39.    In its role as the medical replacement designee, USCRI administers ORR's Refugee Medical Assistance program, which covers the services provided by the County. The Refugee Medical Assistance program reimburses states or replacement designees like USCRI for medical assistance provided to eligible individuals. The provision of those services is mandated by HHS's own regulations. 45 C.F.R. § 400.11 (stating that "ORR will make" cash and medical assistance grants available to the states or to replacement designees). More specifically, the Refugee Medical Assistance program provides up to twelve months of medical coverage to eligible populations who are ineligible for Medicaid, with the benefits mirroring Medicaid. ORR, "Cash and Medical Assistance," HHS, https://acf.gov/orr/programs/refugees/cma [https://perma.cc/SSJ5-S27F] (accessed Mar. 11, 2025). ORR regulations outline the process that USCRI must undertake to obtain and maintain approval from ORR to receive the appropriated refugee resettlement program funding. 45 C.F.R. §§ 400.4–400.9. HHS is also subject to other regulations that more broadly govern the provision of federal grants to non-federal entities. *See, e.g.*, 45 CFR § 75.305(b).

40.    HHS's own website clarifies the importance of the Refugee Medical Assistance program: "The goal is to protect the public health of resettling communities and to promote the self-sufficiency and successful resettlement of refugees." *Id.*

## STATEMENT OF FACTS

11

**C. The County operates its Refugee Medical Screening Program under a contract between ORR and USCRI.**

41.    To fulfill its congressional mandate to facilitate and fund the refugee resettlement programs, ORR contracts with USCRI. USCRI provides the federal grant funding to the County to run Harris County's Refugee Medical Screening Program.

42.    The County's Refugee Medical Screening Program falls under the Refugee Medical Assistance program created by HHS's congressionally-authorized regulations. *See supra* at ¶ 39. Through the Refugee Medical Screening Program, the County serves populations that Congress has specifically designated to benefit from this funding, including refugees, victims of human trafficking, and those on special immigrant visas. The Refugee Medical Screening Program serves over 11,000 refugees and other special populations, including from countries such as Cuba, Venezuela, Afghanistan, and Syria.

43.    Per Congress's mandate, the Refugee Medical Screening Program provides essential medical services to those newly-arrived individuals. The County conducts health screenings, including medical history assessments, physical examinations, and laboratory tests. Additionally, eligible individuals receive necessary immunizations and preventative care to protect their health and prevent the spread of infectious diseases within the community.

44.    Through the Refugee Medical Screening Program, the County has assisted hundreds of thousands of individuals and families for nearly half a decade, as evidenced in part by the continued confidence of ORR and USCRI in the County's services. *See* ORR, "Cash and Medical Assistance," HHS, https://acf.gov/orr/programs/refugees/cma [https://perma.cc/SSJ5-S27F] (accessed Mar. 11, 2025). (noting that ORR is annually informed by USCRI about its plans for operating the Refugee Medical Assistance program, including the County's Refugee Medical Screening Program).

45.    On October 29, 2024, the County was set to receive $10,520,427.30 of funding authorized by Congress for the refugee resettlement programs for fiscal year 2025, as distributed by USCRI.[5]

**D.  Amid the County's ongoing receipt of appropriated funds, the OMB Memorandum instructed HHS to unlawfully withhold all federal grants.**

46.    On January 27, 2025, Matthew J. Vaeth, Acting Director of the Office of Management and Budget ("OMB") issued a memorandum entitled "Temporary Pause of Agency Grant, Loan, and Other Financial Assistance Programs" ("the OMB Memorandum") to all federal agencies, including HHS.

47.    The OMB Memorandum stated that all federal agencies "**must temporarily pause** all activities related to obligation or disbursement of all Federal financial assistance, and other relevant agency activities that may be implicated by the executive orders," including recently-issued executive orders such as Executive Order 14159, "Protecting the American People Against Invasion" (Jan. 20, 2025) (emphasis in original). The OMB Memorandum directed the temporary pause to take effect the next day, at 5 p.m. on January 28.

48.    In addition, the OMB Memorandum instructed all federal agencies "to identify and review all Federal financial assistance programs and supporting activities consistent with the President's policies and requirements." *Id.*

49.    Notably, none of the executive orders specified in the OMB Memorandum apply to the refugee resettlement programs. For example, Executive Order 14159, "Protecting the American People Against Invasion," directed the Attorney General and the Secretary of Homeland Security to review all "contracts, grants, or other agreements providing Federal funding to non-governmental organizations supporting or providing services" to ***immigrants without legal status.***

---

[5]    The current grant period runs from October 1, 2024, to September 30, 2025.

Executive Order 14159 (Jan. 20, 2025). ORR's refugee resettlement programs only assist individuals with documented legal status, *see supra* at ¶ 32. So this Executive Order did not and could not direct any executive action to withhold appropriated funds from the refugee resettlement programs providing congressionally-mandated benefits to documented individuals.

50.     Similarly, Executive Order 14163, "Realigning the United States Refugee Admissions Program" was not specifically named in the OMB Memorandum. It also does not apply here. Executive Order 14163 (Jan. 20, 2025). That Executive Order purported to direct the State Department not to admit additional refugees into the United States. But ORR's refugee resettlement program only provides benefits to individuals who have already been admitted. *See supra* at ¶ 32. Again, that Executive Order did not and could not direct executive action to freeze or withhold funds appropriated for the refugee resettlement programs.

51.     On January 29, 2025, OMB rescinded the OMB Memorandum when faced with litigation challenges. *See infra* at ¶¶ 67–71.

52.     Despite the recission, the federal government issued multiple statements suggesting that federal agencies—including HHS—would continue to effectuate the unlawful freeze of appropriated funds. For example, White House Press Secretary Karoline Leavitt stated, "This is NOT a recission of the federal funding freeze. It is simply a recission of the OMB memo. Why? To end any confusion created by the court's injunction. The President's EO's on federal funding remain in full force and effect, and will be rigorously implemented."[6] *See also* Jeff Stein, et al., *White House Pauses all Federal Grants, Sparking Confusion*, Washington Post (Jan. 27, 2025, updated Jan. 28, 2025) ("A person familiar with the order, speaking on the condition of anonymity

---

[6] Karoline Leavitt X Posting (Jan. 29, 2025).
https://x.com/PressSec/status/1884672871944901034?mx=2 [https://perma.cc/92QZ-DX7B].

to describe confidential decisions, confirmed the accuracy of the document and said it applied to all grants.").

**E.  Immediately after the OMB Memorandum was issued, HHS abruptly stopped fulfilling its obligations to administer funds for the refugee resettlement program.**

53.    In January 2025, HHS abruptly began to starve out the refugee resettlement programs in the County by depriving it of federal grant funding.

54.    On January 29, 2025, two days after the OMB Memorandum was issued, the County informed USCRI of its December 2024 expenses ($1,195,991.28).

55.    On February 5, 2025, the County informed USCRI of its January 2025 expenses ($701,407.03).

56.    On March 6, 2025, the County informed USCRI of its February 2025 expenses ($505,914.81).

57.    On April 4, 2025, the County informed USCRI of its March 2025 expenses ($472,260.78).

58.    On March 5, 2025, the County emailed HHS seeking "help securing payment for our refugee health services program." In that email, the County informed HHS that it had not received its funds via USCRI for the County's December 2024 and January 2025 expenses. The County stated that it understood the issue to stem from HHS's actions, "because USCRI's funds are frozen by ORR." HHS did not respond for two weeks. *See infra* at ¶ 61.

59.    On March 10, 2025, USCRI sent the County a letter stating that "[d]ue to delayed reimbursement of funds since January 21, 2025, USCRI is forced to suspend [its refugee resettlement program] services effective March 14, 2025." USCRI explained that "[t]his suspension is caused by the lack of timely reimbursements from ORR."

60.     In addition, USCRI's letter attached an FAQ sheet. In the FAQ sheet, USCRI explained that the suspension "was necessitated by the failure of ORR to reimburse USCRI for outstanding invoices, despite repeated and continuous efforts by USCRI to seek such payments." USCRI explained that the suspension of the refugee resettlement programs "will continue until USCRI receives payments on its outstanding claims to ORR."

61.     On March 20, 2025, over two weeks later, HHS finally confirmed receipt of the County's March 5, 2025 email. In its response, HHS stated, "I'll get started on your request."

62.     The next day, on March 21, 2025, USCRI informed the County that ORR had released funds for all expenses incurred through January 19, 2025. Not coincidentally, the recent preliminary injunction order in *Pacito v. Trump et al.*, a suit in the Western District of Washington, had instructed HHS to release all withheld refugee resettlement program grant funding appropriated up to January 20, 2025.[7]

63.     Despite HHS's recent release of some federal grant funds, the County still faces nearly $1.25M of outstanding costs incurred by its provision of congressionally-mandated services:

- $271,049.09 still outstanding for the remainder of January 2025;

- $505,914.81 still outstanding for February 2025;

- $473,004.62 for March 2025.

64.     In addition, if the County continues its provision of congressionally-mandated services, it estimates accruing an additional $4.9M in costs for April 2025 until the end of the grant period in September 2025.

---

[7] Order Issuing Preliminary Injunction (ECF No. 45), *Pacito et al. v. Trump et al.*, No. 2:25-cv-255-JNW (W.D. Wa. filed Feb. 10, 2025).

65.     In sum, since the issuance of the OMB Memorandum, HHS has refused to administer nearly $1.25M congressionally-appropriated funds that should flow to the County—effectively starving to death the County's congressionally-authorized refugee resettlement programs. HHS has not communicated any justification for this arbitrary and abrupt action.

**F. HHS continues to attack the refugee resettlement programs via its funding stream, despite various courts' preliminary injunctions blocking HHS from doing so.**

66.     At least three ongoing cases in this Court and elsewhere have blocked HHS's unlawful withholding of federal funds, either via a challenge to the OMB Memorandum or a challenge specific to HHS's withholding of refugee resettlement program funding.

67.     ***The OMB Memorandum Case in this Court:*** Shortly after the OMB Memorandum was issued, various plaintiff states sued OMB. On January 28, 2025, Judge Loren AliKhan of this Court issued an administrative stay, preventing the OMB Memorandum from going into effect.[8]

68.     On February 3, 2025, Judge Alikhan issued a temporary restraining order enjoining OMB from "implementing, giving effect to, or reinstating under a different name the directives in [the OMB Memorandum] with respect to the disbursement of Federal funds under all open awards[.]"[9]

69.     Most recently, on February 25, 2025, Judge AliKhan granted a preliminary injunction blocking any continued attempts to freeze or withhold federal grant funds, including those at issue in this case that are obligated to the County.[10]

---

[8] Order of Administrative Stay (ECF No. 13), *Nat'l Council of Nonprofits, et al. v. OMB*, No. 1:25-cv-00239-LLA (D.D.C. filed Jan. 28, 2025).
[9] Temporary Restraining Order (ECF No. 30), *Nat'l Council of Nonprofits, et al. v. OMB*, No. 1:25-cv-00239-LLA (D.D.C. filed Feb. 3, 2025).
[10] Order Granting Preliminary Injunction (ECF No. 25), *Nat'l Council of Nonprofits, et al. v. OMB*, No. 1:25-cv-00239-LLA (D.D.C. filed Feb. 3, 2025).

70.     ***The OMB Memorandum Case in the District of Rhode Island:*** Various plaintiff states sued multiple federal agency defendants in the District of Rhode Island, including HHS, in a challenge to the OMB Memorandum. On January 31, Judge John McConnell Jr. of the District of Rhode Island issued a temporary restraining order enjoining HHS and the other defendant agencies from "reissuing, adopting, implementing, or otherwise giving effect to the [OMB Memorandum] under any other name or title" by any means.[11] In response, HHS and the other defendant agencies issued a notice stating that this prohibition applied to "all awards or obligations—not just those involving the Plaintiff States in the above-referenced case—and also applies to future assistance (not just current or existing awards or obligations)."

71.     On February 10, 2025, Judge McConnell Jr. granted a motion to enforce that temporary restraining order, on the basis that the defendant federal agencies—including HHS— were not complying with the court's order.[12]

72.     ***The Refugee Resettlement Program Funding Case in the Western District of Washington:*** On February 10, 2025, individual refugee plaintiffs sued multiple defendants, including HHS Secretary Kennedy. On February 28, 2025, Judge Jamal N. Whitehead of the Western District of Washington issued a preliminary injunction enjoining HHS from withholding refugee resettlement program funding for work performed before January 20, 2025.[13] There, that

---

[11] Temporary Restraining Order (ECF No. 50), *New York et al., v. Trump* et al., No. *1:25-cv-00039-JJM-PAS* (D.R.I. filed Jan. 31, 2025).

[12] Order Granting Motion to Enforce Temporary Restraining Order (ECF No. 96), *New York et al., v. Trump et al.*, No. 1:25-cv-00039-JJM-PAS (D.R.I. filed Feb. 10, 2025); *see also* Plaintiffs' Motion to Enforce Temporary Restraining Order (ECF No. 66), *New York et al., v. Trump et al.*, No. 1:25-cv-00039-JJM-PAS (D.R.I. filed Feb. 7, 2025).

[13] Order Issuing Preliminary Injunction (ECF No. 45), *Pacito et al. v. Trump et al.*, No. 2:25-cv-255-JNW (W.D. Wa. filed Feb. 10, 2025).

court found that plaintiffs had shown a likelihood of success on the merits on their APA claim against Secretary Kennedy, including their arguments that

- HHS's *sub silentio* failure to provide refugee resettlement program funds was a final agency action reviewable under the APA; and

- the action was contrary to law and arbitrary and capricious under the APA.

73.     That court's order required HHS to distribute refugee resettlement program funds for work performed before January 20, 2025. In apparent compliance with this order, HHS has released the appropriated funds for work performed up to January 19, 2025. But this belated release does not change the HHS's effective cancellation of the refugee resettlement programs in the County, via an unlawful blockade of federal grant funding for work performed by the County from January 20, 2025 to the present.

74.     ***The Refugee Resettlement Program Funding Case in this Court:*** On March 3, 2025, plaintiff Catholic Charities Fort Worth ("CCFW")—the replacement designee for the Dallas-Fort Worth area of Texas—filed a complaint for declaratory and injunctive relief from HHS's actions against the refugee resettlement program.[14] On March 12, 2025, this Court heard arguments for a temporary restraining order. Most recently, HHS informed the Court that it had released all appropriated federal grant funds due to CCFW, and would continue to do so.[15]

## G. Defendants' effective starvation of the refugee resettlement program has inflicted irreparable harm on the County—and will continue to do so.

75.     HHS's decision to cut off the refugee resettlement programs administered by the County has had, and will have, devastating and irreparable effects. Even if HHS provides access to the necessary federal grants at an unknown future time, the County will have been irreparably

---

[14] Complaint (ECF No. 1), *Catholic Charities Diocese of Forth Worth, Inc. v. HHS et al.*, No. 1:25-cv-00605-LLA (D.D.C. filed Mar. 3, 2025).

[15] Joint Status Report (ECF No. 22), *Catholic Charities Diocese of Forth Worth, Inc. v. HHS et al.*, No. 1:25-cv-00605-LLA (D.D.C. filed Mar. 17, 2025).

harmed, and its Refugee Medical Screening Program will have been dealt a fatal blow. That harm will continue until the programs, and their funding lifeline, are restored on a guaranteed basis.

76.    First, the County's Refugee Medical Screening Program is *entirely* funded by the refugee resettlement program funds administered by ORR, for a total of over $10.5M for the fiscal year. The County cannot continue its critical, congressionally-approved work without the funds that Congress has already authorized. The withholding of funding effectively starves the County's Refugee Medical Screening Program to death—thus irreparably harming the County, its work, and its mission. It impairs the County's ability to pay existing employee salaries and contractors, which will force the County to terminate or reassign staff whose institutional knowledge will be lost. It forces the County to downsize its clinic space and cease provisions of these congressionally-mandated services. It will result in devastating public-health impacts to both the served populations and the broader community. And it irreparably harms the County's reputation in the community.

77.    HHS's unlawful actions threaten the fundamental integrity of the County's Refugee Medical Screening Program. Were the County to continue for the remaining seven-month period that should be covered by its federal grant funding (April 2025–September 2025), the County would face an additional $4.9M in unreimbursed expenses, for a total of over $6M in withheld federal grant funding. Without intervention, the Refugee Medical Screening Program will shut down.

78.    HHS has already harmed the County's ability to staff its program. Due to the uncertainty caused by HHS's actions, nineteen (19) positions are unfilled, creating service delays. Over 3,000 refugees are currently waiting for services, including infectious disease testing. At current, already-impacted staffing levels, it would take until December 2025 to complete these

remaining screenings, a backlog that harms the waiting individuals and the communities in which they live.

79.    HHS's actions mean that the County cannot even sustain its current, understaffed levels of service. Although 37 staff members remain with the Program, many if not most or all will have to be laid off due to HHS's unlawful decision to sever the Refugee Medical Screening Program's funding lifeline. These staff cuts will cause irreversible damage to the Program. Specialized staff shortages are difficult to reverse, as hiring takes months to years due to language skills, cultural competency, and refugee healthcare expertise. The County also maintains two physical clinic locations with leases paid for by the congressionally-appropriated funding. Both are threatened by HHS's unlawful actions and set to potentially close. Without physical clinics, the County cannot provide the medical services mandated by Congress.

80.    In addition, the community has already been, and will continue to be, irreparably harmed by HHS's effective termination of the County's Refugee Medical Screening Program. The Program serves over 11,000 individuals from eligible populations by providing essential health screenings, immunizations, and connections to primary care. As Congress has recognized, those services are fundamental to the well-being of a population with extremely limited resources. Because the County cannot continue its program, these individuals now face significant barriers to healthcare. Disruption of these essential services would also have far-reaching public-health consequences for the broader community. For example, individuals will not receive the communicable-disease screening, parasitic-infection testing, and lead-level testing necessary for population health. That will result in higher rates of undiagnosed infectious diseases and create a higher likelihood of community spread of illnesses like tuberculosis and hepatitis B. These legally-admitted individuals will face increased emergency room visits and uncompensated hospital care,

driving up healthcare costs and straining county hospitals. Finally, the potential for disease outbreaks endangers both the refugee population and the broader community.

81.    Due to these broad, community-wide public-health impacts, HHS also irreparably harms the County's mission of supporting and protecting the public health of its residents. Without federal grant funding necessary to run the Refugee Medical Screening Program, the County cannot provide the important, congressionally-mandated care needed to support these legally-admitted individuals whom it serves.

82.    Finally, the County has seen that HHS's actions have seriously eroded trust and confidence within the communities with whom it is engaged. Again, the County has engaged with these communities to fulfill Congress's objectives of welcoming individuals who are lawfully admitted to the United States by statute. As a result of HHS's unlawful actions, the damage to the County's reputation is lasting and irreparable.

## CAUSES OF ACTION

### COUNT I
**Substantive Violation of the Administrative Procedure Act
Contrary to Law – Statutory Authority, Appropriations Act, and Spending Clause**

83.    Plaintiff incorporates by reference the allegations contained in the preceding paragraphs.

84.    Under the APA, a court must "hold unlawful and set aside agency action, findings, and conclusions found to be . . . contrary to constitutional right, power, privilege, or immunity," or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right, " or "without observance of the procedure required by law." 5 U.S.C. §§ 706(2)(B)–(D).

85.    Here, HHS has decided to cut off the refugee resettlement programs by starving them of essential funding. HHS has thus effectuated a *sub silentio* termination of these programs. That unlawful action undermines the Constitution's separation of powers under the Spending

Clause and Appropriations Clause; contravenes statutes requiring HHS to administer and distribute the refugee resettlement program funding; and violates the Impoundment Control Act's substantive requirements.

86.     First, the Constitution grants spending power to Congress, not the President. The Spending Clause of the Constitution vests Congress with the power to expend those funds for the "general welfare of the United States." U.S. Const. art. I, § 8, cl. 1. Courts have consistently interpreted the Spending Clause as allowing Congress to require the Executive Branch to spend funds. *See, e.g.*, *Consumer Fin. Prot. Bureau v. Cmty. Fin. Servs. Ass'n of Am., Ltd.*, 601 U.S. 416, 420 (2024) ("Our Constitution gives Congress control over the public fisc.").

87.     Similarly, the Appropriations Clause provides that "public funds will be spent according to the letter of the difficult judgments reached by Congress as to the common good and not according to the individual favor of Government agents." *Off. of Pers. Mgmt. v. Richmond*, 496 U.S. 414, 427–28 (1990).

88.     The executive thus cannot unilaterally amend or cancel appropriations that Congress has duly enacted. *See Train v. City of New York*, 420 U.S. 35, 38, 44 (1975); *In re Aiken Cnty.*, 725 F.3d 255, 261 n.1 (D.C. Cir. 2013); 2 U.S.C. § 683 (requiring the President to transmit proposed rescissions of budget authority to Congress for approval and requiring "any amount of budget authority proposed to be rescinded" to be made available for obligation unless and until Congress approves the rescission within 45 days). No provision of the United States Constitution authorizes the executive to enact, amend, or repeal statutes, including appropriations approved by Congress and signed into law by the President. *Clinton v. City of New York*, 524 U.S. 417, 438 (1998); *see also State of La. ex rel. Guste v. Brinegar*, 388 F. Supp. 1319, 1324–25 (D.D.C. 1975).

89.     By failing to fulfill its congressionally-mandated obligations to distribute appropriated refugee resettlement program funding, HHS thus unlawfully defies congressional authority and fundamental separation-of-powers law. Congress has explicitly commanded the Executive Branch to promptly distribute refugee resettlement program funding to those providing the program services, including for the period at issue here. *See, e.g.*, Consolidated Appropriations Act of 2023, Pub L. 117-328, 136 Stat. 4459, 4870–71 (Dec. 29, 2022) (appropriating over $6.3 billion for the refugee resettlement programs, to be available through September 30, 2025); Pub. L. 117-180, 136 Stat. 2114, 2123 (Sep. 30, 2022) (appropriating nearly $1.8 billion for refugee resettlement programs serving Afghan refugees, to be available through September 30, 2025).

90.     In addition, Congress has set out clear instructions governing this refugee resettlement program grant funding. *See supra* at pp. 7–11. HHS lacks to the authority to cancel appropriations without regard to the individual authorizing statutes, regulations, and terms that govern each funding stream. Here, this effective cancellation of federal appropriations is unauthorized, and not entitled to respect or deference by this Court.

91.     HHS's unilateral executive action to effectively cancel Congress's appropriations for the refugee resettlement programs thus unconstitutionally infringes on Congress's spending and appropriations powers.

92.     HHS's actions are also unlawful because they violate the Impoundment Control Act. The Impoundment Control Act of 1974, 2 U.S.C. §§ 681 *et seq.*, circumscribes HHS's authority to immediately, categorically, and indefinitely pause obligated grant funding under the refugee resettlement programs. The Impoundment Control Act permits the Executive Branch to impound federal funds only under a very narrow set of specific circumstances. The Impoundment Control Act does not permit the Executive Branch to defer appropriated funds based on policy

disagreement with Congressional priorities, nor rescind them without Congressional approval. Nor does the Impoundment Control Act permit agencies to unilaterally, categorically, immediately, and indefinitely cancel federal grants.

93.     Under 5 U.S.C. § 706 and 28 U.S.C. § 2201, the County is entitled to a declaration that HHS lacks legal authority to effectively cancel federal grants appropriated for refugee resettlement programs. The County is additionally entitled to a declaration that HHS acted contrary to law and in violation of the APA by doing so.

94.     Because HHS's withholding or freeze of the refugee resettlement program funds is contrary to law in violation of the APA, this Court must also set aside HHS's action.

**COUNT II**
**Substantive Violation of the Administrative Procedure Act – Arbitrary & Capricious**

95.     Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs.

96.     The APA requires that a court "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

97.     An agency action is arbitrary or capricious where it is not "reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). This requires that an agency provide "a satisfactory explanation for its action[,] including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (internal quotation marks omitted). An action is also arbitrary and capricious if the agency "failed to consider . . . important aspects of the problem" before it. *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 591 U.S. 1, 25 (2020) (quoting *Motor Vehicle Mfrs.*, 463 U.S. at 43).

98.    HHS's *sub silentio* starvation of the County's refugee resettlement program represents arbitrary and capricious agency action. HHS has given no reasoned explanation for its decision to cut off this funding stream. HHS has ignored its own regulations. As described above, HHS has failed to give the County *any* explanation.

99.    First, HHS has offered no explanation suggesting that it has complied with the payment provisions of the agency's own regulations. *See* 45 C.F.R. § 75.305(b)(1). Without explanation, HHS's departure from its own regulations independently violates the APA and is arbitrary and capricious. *See F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009) ("An agency may not, for example, depart from a prior policy *sub silentio* . . .").

100.    Second, HHS has failed to demonstrate *any* kind of reasoned decision making regarding the irreparable harms that their actions have had on the County and the populations the County serves. Those harms include irreparable damage to the County's ability to manage its budget, its employees, its reputation, and the legally-documented, admitted individuals that the County serves through its Refugee Medical Screening Program. Nor has HHS demonstrated any reasoned decision making concerning the harms that will result to the County's residents more broadly. HHS's failure of reasoned decision making and failure to consider important aspects of the problem both constitute an arbitrary and capricious violation of the APA.

101.    Nor has HHS pointed to *any* statute or regulation that lawfully permits HHS to persist in its *sub silentio* cancellation of the County's programs. As stated above, no Executive Order could satisfy the requirements for legal authority under the APA. Even if any Order did, all Executive Orders concerning immigration do not apply to the appropriated refugee resettlement funding mandated by Congress to benefit legally-admitted, documented individuals.

102.    Finally, HHS has disclosed to Judge AliKhan of this Court that other recipients of the refugee resettlement program grants have received their funding, including for the period from January 20, 2025 onwards. Based on HHS's statements, it has only targeted the funding streams for refugee resettlement programs in Texas. *See Catholic Charities, Diocese of Forth Worth, Inc. v. HHS*, Civ. No. 25-605 (LLA), Defendants' Response to Order of the Court, ECF No. 20, at ¶¶ 8, 12, 14, 15 (D.D.C. filed Mar. 12, 2025). Defendants have since restarted their grants  to Catholic Charities, Diocese of Fort Worth, Inc. The lack of explanation for HHS's targeting of the refugee resettlement programs administered by the County, as opposed to other entities, is itself arbitrary and capricious under the APA.

103.    In short, HHS has not and cannot articulate any reasoned basis for choking off the County's refugee resettlement programs, via withholding the appropriated federal grants. HHS has thus acted arbitrarily and capriciously in violation of the APA.

104.    Under 5 U.S.C. § 706 and 28 U.S.C. § 2201, the County is entitled to a declaration that HHS's action against the County's refugee resettlement program is an arbitrary and capricious violation of the APA.

105.    Because HHS has arbitrarily and capriciously refused to provide the refugee resettlement program federal grants, this Court must set aside HHS's action as violative of the APA.

### COUNT III
### Non-Statutory, Non-APA Claim – Violation of Separation of Powers

106.    Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs.

107.    As stated above, Congress has instructed HHS's ORR to administer and distribute funding appropriated for the refugee resettlement program, including the refugee resettlement

program grants that flow down to the County. The HHS Secretary is responsible for the administration of funds appropriated to ORR, through HHS.

108.    HHS's refusal to follow Congress's appropriations for the refugee resettlement programs undermines the Constitution's separation of powers under the Spending Clause and Appropriations Clause.

109.    First, the Constitution grants spending power to Congress, not the President. The Spending Clause of the Constitution vests Congress with the power to expend those funds for the "general welfare of the United States." U.S. Const. art. I, § 8, cl. 1. Courts have consistently interpreted the Spending Clause as allowing Congress to require the Executive Branch to spend funds. *See, e.g.*, *Consumer Fin. Prot. Bureau v. Cmty. Fin. Servs. Ass'n of Am., Ltd.*, 601 U.S. 416, 420 (2024) ("Our Constitution gives Congress control over the public fisc.").

110.    Similarly, the Appropriations Clause provides that "public funds will be spent according to the letter of the difficult judgments reached by Congress as to the common good and not according to the individual favor of Government agents." *Off. of Pers. Mgmt. v. Richmond*, 496 U.S. 414, 427–28 (1990).

111.    The executive thus cannot unilaterally amend or cancel appropriations that Congress has duly enacted. *See Train v. City of New York*, 420 U.S. 35, 38, 44 (1975); In re *Aiken Cnty.*, 725 F.3d 255, 261 n.1 (D.C. Cir. 2013); 2 U.S.C. § 683 (requiring the President to transmit proposed rescissions of budget authority to Congress for approval and requiring "any amount of budget authority proposed to be rescinded" to be made available for obligation unless and until Congress approves the rescission within 45 days).  No provision of the United States Constitution authorizes the executive to enact, amend, or repeal statutes, including appropriations approved by

Congress and signed into law by the President. *Clinton v. City of New York*, 524 U.S. 417, 438 (1998); *see also State of La. ex rel. Guste v. Brinegar*, 388 F. Supp. 1319, 1324–25 (D.D.C. 1975).

112.    By failing to fulfill its congressionally-mandated obligations to distribute appropriated refugee resettlement program funding, HHS thus unlawfully defies congressional authority and fundamental separation-of-powers law. Congress has explicitly commanded the Executive Branch to promptly distribute refugee resettlement program funding to those providing the program services, including for the period at issue here. *See, e.g.*, Consolidated Appropriations Act of 2023, Pub L. 117-328, 136 Stat. 4459, 4870–71 (Dec. 29, 2022) (appropriating over $6.3 billion for the refugee resettlement programs, to be available through September 30, 2025); Pub. L. 117-180, 136 Stat. 2114, 2123 (Sep. 30, 2022) (appropriating nearly $1.8 billion for refugee resettlement programs serving Afghan refugees, to be available through September 30, 2025).

113.    In addition, Congress has set out clear instructions governing this refugee resettlement program grant funding. See supra at pp. 7–11. HHS lacks the authority to withhold any federal awards without regard to the individual authorizing statutes, regulations, and terms that govern each funding stream. This withholding or freeze of federal assistance is unauthorized, and not entitled to respect or deference by this Court.

114.    HHS's unilateral executive action to withhold or freeze funds appropriated by Congress for the refugee resettlement programs thus unconstitutionally infringes on Congress's spending and appropriations powers.

115.    Because HHS has arbitrarily and capriciously refused to provide the refugee resettlement program federal grants—effectively terminating the programs—the County is entitled to the declaratory and injunctive relief sought here.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Harris County prays that this Court:

1.      Declare that HHS's *sub silentio* cancellation of congressional appropriations for the refugee resettlement programs, as applied to the County, is contrary to law under the APA;

2.      Declare that HHS's *sub silentio* cancellation of congressional appropriations for the refugee resettlement programs , as applied to the County, is arbitrary and capricious under the APA;

3.      Declare that HHS's *sub silentio* cancellation of congressional appropriations for to provide the refugee resettlement programs , as applied to the County, is in violation of the U.S. Constitution's separation of powers;

4.      Hold as unlawful and set aside HHS's actions regarding the refugee resettlement program grants, as applied to the County;

5.      Enjoin—temporarily, preliminarily, and permanently—HHS from taking any action enforcing or implementing against the County any effective cancellation of the refugee resettlement program, including cancellation of any appropriations for the refugee resettlement programs before the end of the period authorized by Congress; and

6.      Award the County reasonable fees, costs, and expenses, including attorneys' fees, pursuant to 28 U.S.C. § 2412; and

7.      Grant other such relief as this Court may deem proper.


DATED:  April 8, 2025

Respectfully submitted,


**CHRISTIAN D. MENEFEE**
HARRIS COUNTY ATTORNEY

**JONATHAN G.C. FOMBONNE**
DEPUTY COUNTY ATTORNEY AND FIRST
ASSISTANT

**TIFFANY BINGHAM**
MANAGING COUNSEL,
AFFIRMATIVE & SPECIAL LITIGATION


*/s/ Nina L.M. Oishi*
**NINA L.M. OISHI**
Assistant County Attorney
Texas State Bar No. 24142250
D.D.C. Bar ID: TX0085
nina.oishi@harriscountytx.gov
C: (832) 596-4809

**JONATHAN G.C. FOMBONNE**
Deputy County Attorney and First Assistant
Texas State Bar No. 24102702
D.D.C. Bar ID: TX0090
jonathan.fombonne@harriscountytx.gov

**TIFFANY BINGHAM**
Managing Counsel
Texas State Bar No. 24012287
D.D.C. Bar ID: TX0087
tiffany.bingham@harriscountytx.gov
C: (713) 274-5132

**ELEANOR MATHESON**
Assistant County Attorney
Texas State Bar No. 24131490
D.D.C. Bar ID: TX0086
eleanor.matheson@harriscountytx.gov
C: (832) 712-3827


**ATTORNEYS FOR PLAINTIFF
HARRIS COUNTY**

31

## CERTIFICATE OF SERVICE

I hereby certify that a true and accurate copy of the foregoing document was filed electronically on April 8, 2025, with the Clerk of the Court for the U.S. District of Columbia by using the CM/ECF system, causing electronic service upon all counsel of record.

*/s/ Nina L.M. Oishi*

Nina L.M. Oishi