# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

**HARRIS COUNTY, TEXAS,**

    *Plaintiff,*

v.

**U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES ("HHS"),**

*and*

**ROBERT F. KENNEDY, JR., SECRETARY OF HHS, IN HIS OFFICAL CAPACITY,**

    *Defendants.*

Civ. No. 1:25-cv-01058

---

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF HARRIS COUNTY'S MOTION FOR A TEMPORARY RESTRAINING ORDER

Plaintiff Harris County ("the County") brings this action against the Department of Health and Human Services and HHS Secretary Robert F. Kennedy, Jr. (collectively, "HHS") to challenge HHS's  arbitrary and unconstitutional  decision to cut off federal grant funding obligated to the County—effectively causing a de facto cancellation of the refugee resettlement programs mandated by Congress. Shortly after the new Trump Administration took office in January 2025, federal government agencies attempted to unlawfully withhold and freeze federal grant funds via an OMB Memorandum, including the refugee resettlement program grant funds at stake here. While many entities have received their federal funding in the weeks since the attempted funding freeze, the Department of Health and Human Services ("HHS") has not released the County's funds—jeopardizing the County's congressionally-approved program providing essential medical care to legally-admitted individuals.

The County's Refugee Medical Screening Program is entirely funded by the refugee resettlement program funds administered by HHS's Office of Refugee Resettlement ("ORR"), for a total of over $10.5M for the fiscal year. The County cannot continue its critical, congressionally-approved work without the funds that Congress has already authorized. HHS's action irreparably forces the County to stop its provision of services and cut staff, resulting in devastating downstream community harms and an effective end to the program.

## BACKGROUND

For decades, the County has provided essential medical services to 11,000 newly-arrived, legally-documented individuals each year through the Congressionally-mandated and appropriated refugee resettlement program. The refugee resettlement program serves refugees and other statutorily-specified categories of admitted recent immigrants with documented legal status, including from countries like Cuba, Haiti, and Afghanistan, to whom the United States government has specifically granted entry.[1]

**A. For decades, the County has provided essential medical services to newly-arrived individuals through its Refugee Medical Screening Program.**

For over forty years, the County has provided essential, congressionally-mandated services to these documented and lawfully-admitted individuals. For those services, the County receives appropriated refugee resettlement program grant funding under a contract between HHS and the United States Committee for Refugees and Immigrants ("USCRI"), which serves as the medical replacement designee across Texas.[2]

---

[1] HHS's Office of Refugee Resettlement ("ORR") collectively refers to these eligible individuals as "refugees."

[2] See ORR, Dear Colleague Letter 17-03 (Mar. 3, 2017), available at https://acf.gov/orr/policy-guidance/texas-replacement-designees [https://perma.cc/ZN24-PYHB] (accessed Mar. 6, 2025).

The County's Refugee Medical Screening Program falls under the Refugee Medical Assistance program created by HHS's congressionally-authorized regulations. Through the Refugee Medical Screening Program, the County conducts health screenings, including medical history assessments, physical examinations, and laboratory tests. Additionally, eligible individuals receive necessary immunizations—up to 35,000 a year. The County also connects eligible individuals with preventative care, to protect their health and prevent the spread of infectious diseases within the community.

Most recently, the County accepted $10,520,427.30 of funding authorized by Congress for the refugee resettlement programs for fiscal year 2025,[3] as distributed by USCRI. The County agreed to accept that appropriated funding in October 2024.

**B. The OMB Memorandum purported to freeze all federal grant funding, including the refugee resettlement program grant funds at stake here.**

On January 27, 2025, Matthew J. Vaeth, Acting Director of the Office of Management and Budget ("OMB") issued memorandum M-25-13 entitled "Temporary Pause of Agency Grant, Loan, and Other Financial Assistance Programs" ("the OMB Memorandum") to all federal agencies, including HHS. The OMB Memorandum stated that all federal agencies "**must temporarily pause** all activities related to obligation or disbursement of all Federal financial assistance, and other relevant agency activities that may be implicated by the executive orders," including recently-issued executive orders." The OMB Memorandum directed the temporary pause to take effect the next day, at 5 p.m. on January 28, with no end date.

Notably, none of the executive orders specified in the OMB Memorandum apply to the refugee resettlement programs. The President has issued executive orders purporting to limit

---

[3]        The current grant period runs from October 1, 2024, to September 30, 2025.

immigration and the admission of new refugees. But those orders do not apply to the refugee resettlement programs at stake here, which only assist individuals with documented legal status. *See* 8 U.S.C. § 1522(a)(3); 45 C.F.R. § 400.43(a).

On January 29, 2025, OMB rescinded the OMB Memorandum when faced with litigation challenges. At least three courts have issued orders enjoining HHS from giving effect to the OMB Memorandum, including Judge AliKhan of this Court.[4] But elsewhere, the federal government issued multiple statements suggesting that federal agencies—including HHS—would continue to effectuate the unlawful freeze of appropriated funds.[5]

## C. Immediately after the OMB Memorandum was issued, HHS abruptly stopped fulfilling its obligations to the refugee resettlement programs.

Since the issuance of the OMB Memorandum, the County informed USCRI multiple times of its requests for payment for work already performed, including work performed before the new administration took office and the issuance of the OMB Memorandum. On January 29, 2025, two days after the OMB Memorandum was issued, the County informed USCRI of its December 2024 expenses ($1,195,991.28). Decl. ¶ 11. On February 5, 2025, the County informed USCRI of its January 2025 expenses ($701,407.03). *Id.* ¶ 12. On March 6, 2025, the County informed USCRI of its February 2025 expenses ($505,914.81). *Id.* ¶ 13. On April 4, 2025, the County informed USCRI of its February 2025 expenses ($472,260.78). Although ORR has since released federal

---

[4] Order Granting Preliminary Injunction (ECF No. 25), *Nat'l Council of Nonprofits, et al. v. OMB*, No. 1:25-cv-00239-LLA (D.D.C. filed Feb. 3, 2025); Order Granting Motion to Enforce Temporary Restraining Order (ECF No. 96), *New York et al., v. Trump et al.*, No. 1:25-cv-00039-JJM-PAS (D.R.I. filed Feb. 10, 2025); Order Issuing Preliminary Injunction (ECF No. 45), *Pacito et al. v. Trump et al.*, No. 2:25-cv-255-JNW (W.D. Wa. filed Feb. 10, 2025).

[5] *E.g.*, White House Press Secretary Karoline Leavitt, X Posting (Jan. 29, 2025). https://x.com/PressSec/status/1884672871944901034?mx=2 [https://perma.cc/92QZ-DX7B] ("This is NOT a recission of the federal funding freeze. It is simply a recission of the OMB memo. Why? To end any confusion created by the court's injunction. The President's EO's on federal funding remain in full force and effect, and will be rigorously implemented.").

grant funds for December 2024 through January 19, 2025, nearly $1.25M remains unfulfilled. *Id.* ¶¶ 15, 21.

Despite repeated communications sent to HHS by both the County and USCRI, the County has received no indication that HHS will fulfill its obligations to the refugee resettlement program, including administration of grant funding for work done in the past or future. On February 12, 2025, USCRI informed the County that, to their knowledge, USCRI and Catholic Charities, Diocese of Fort Worth, Inc. ("CCFW") were the only entities nationally that had yet to receive the funding from HHS that had been congressionally-appropriated for the refugee resettlement program. *Id.* ¶ 16. The County has since learned that on February 25, 2025, USCRI sent a letter to ORR seeking information about the unreleased federal grant funding. *Id.* ¶ 19. USCRI's letter additionally informed ORR that eligible individuals, including those served by the County's refugee resettlement programs, would "suffer irreparable and in some instances life threatening consequences due to ORR's failure to provide funding." *Id.* ¶ 19. To the County's knowledge, HHS has not given USCRI an explanation regarding the withholding of federal grant funding. *Id.*

On March 5, 2025, the County emailed HHS seeking "help securing payment for our refugee health services program." In that email, the County informed HHS that it had not received its funds via USCRI for the County's December 2024 and January 2025 expenses, and that it would soon submit its February expenses to USCRI. The County stated that it understood the issue to stem from HHS's actions, "because USCRI's funds are frozen by ORR."

On March 10, 2025, USCRI sent the County a letter stating that "[d]ue to delayed reimbursement of funds since January 21, 2025, USCRI is forced to suspend [its refugee resettlement program] services effective March 14, 2025." *Id.* ¶ 18. USCRI explained that "[t]his suspension is caused by the lack of timely reimbursements from ORR." *Id.* In addition, USCRI's

March 10, 2025 letter attached an FAQ sheet. In the FAQ sheet, USCRI explained that the suspension "was necessitated by the failure of ORR to reimburse USCRI for outstanding invoices, despite repeated and continuous efforts by USCRI to seek such payments." *Id.* ¶ 20. USCRI explained that the suspension of the refugee resettlement programs "will continue until USCRI receives payments on its outstanding claims to ORR." *Id.*

In short: immediately after the issuance of the OMB Memorandum, HHS began to withhold congressionally-appropriated funds that should flow to the County for the provision of congressionally-authorized refugee resettlement programs.

**D. After a preliminary injunction was issued in the Western District of Washington, HHS released federal grant funds through January 19, 2020—but continues to withhold funding, despite releasing it to other entities.**

At the same time, other challenges to HHS's unlawful behavior were progressing in various federal courts. On February 10, 2025, individual refugee plaintiffs sued multiple defendants, including the HHS Secretary, in *Pacito v. Trump et al.* in the Western District of Washington.[6] On February 28, 2025, the Honorable Jamal N. Whitehead issued a preliminary injunction in that case, determining that plaintiffs had shown a likelihood of success on the merits on their APA claim against Secretary Kennedy. That court agreed that HHS's unlawful *sub silentio* withholding of refugee resettlement program funds was a final agency action reviewable under the APA and that the withholding or freeze of the refugee resettlement program grant funds was contrary to law and arbitrary and capricious under the APA. Judge Whitehead's order enjoined HHS from withholding refugee resettlement program funding for work performed before January 20, 2025.

---

[6] Order Issuing Preliminary Injunction (ECF No. 45), *Pacito et al. v. Trump et al.*, No. 2:25-cv-255-JNW (W.D. Wa. filed Feb. 10, 2025).

HHS did not comply with that order immediately. But perhaps not coincidentally, more than a month later, HHS released funds appropriated for the County's work up to January 19, 2025. On March 20, 2025, over two weeks later, HHS finally confirmed receipt of the County's March 5, 2025 email. Decl. ¶ 17. In its response, HHS stated, "I'll get started on your request." *Id.* The next day, on March 21, 2025, USCRI informed the County that ORR had released funds for all expenses incurred through January 19, 2025. *Id.* ¶ 21.

But other entities have received their refugee resettlement program funding past January 20, 2025. On March 3, 2025, plaintiff Catholic Charities Fort Worth ("CCFW")—the replacement designee for the Dallas-Fort Worth area of Texas—filed a complaint before Judge AliKhan of this Court seeking relief from HHS's unlawful withholding of refugee resettlement program funds.[7] Over the course of that litigation, HHS also revealed that it was only withholding federal grant funding from entities in Texas.[8] On March 12, 2025, this Court heard arguments for a temporary restraining order. Almost immediately after that hearing, HHS informed the Court that it had ceased its withholding of the appropriated federal grant funds due to CCFW.[9]

In short, HHS continues to arbitrarily withhold all federal grant funding for the period from January 20, 2025 to the present, effectively starving the refugee resettlement programs. HHS has not communicated any justification for this arbitrary and abrupt action in violation of Congress's mandate. And HHS continues to withhold these funds, even as it has released funding for that same period to both entities outside Texas and entities within Texas (but only after litigation before this

---

[7] Complaint (ECF No. 1), *Catholic Charities Diocese of Forth Worth, Inc. v. HHS et al.*, No. 1:25-cv-00605-LLA (D.D.C. filed Mar. 3, 2025).
[8] Declaration of Andrew Gradison (ECF No. 20), *Catholic Charities Diocese of Forth Worth, Inc. v. HHS et al.*, No. 1:25-cv-00605-LLA (D.D.C. filed Mar. 3, 2025).
[9] Joint Status Report (ECF No. 22), *Catholic Charities Diocese of Forth Worth, Inc. v. HHS et al.*, No. 1:25-cv-00605-LLA (D.D.C. filed Mar. 17, 2025).

Court). As each day passes, devastating harm accrues to the County and to the individuals served by the County's refugee resettlement program.

## LEGAL STANDARD

To obtain a temporary restraining order, the plaintiff must show: (1) a substantial likelihood of success on the merits; (2) irreparable injury if the order were not granted; (3) that the balance of equities tips in their favor; and (4) that the order is in the public interest. *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006) (citations omitted); *see also Morgan Stanley DW Inc. v. Rothe*, 150 F. Supp. 2d 67, 72 (D.D.C. 2001) ("The court considers the same factors in ruling on a motion for a temporary restraining order and a motion for a preliminary injunction."). Where the government is the defendant, the final two balance-of-equities and public-interest factors merge. *Pursuing Am.'s Greatness v. FEC*, 831 F.3d 500, 511 (D.C. Cir. 2016)).

Courts in this Circuit apply a "sliding scale" approach, wherein "a strong showing on one factor could make up for a weaker showing on another." *Changji Esquel Textile Co. v. Raimondo*, 40 F.4th 716, 726 (D.C. Cir. 2022) (internal quotation marks and citation omitted) (but reserving the question of "whether the sliding-scale approach remains valid"); *National Railroad Passenger Corp. (Amtrak) v. Sublease Interest Obtained Pursuant to an Assignment and Assumption of Leasehold Interest Made as of Jan. 25, 2007*, Case. No. 22-1043 (2024 WL 34443596, at *1–2(D.D.C. July 15, 2024) (recognizing that district courts remain bound by sliding scale precedent).

## ARGUMENT

**A. The County is likely to succeed on the merits of its claims that HHS's unlawful withholding violates the APA.**

HHS's abrupt withholding of the refugee resettlement program grant funding at stake here is contrary to law, including the relevant statutes and regulations and constitutional separation-of-

powers, as well as existing court orders. HHS's abrupt withholding is also arbitrary and capricious. As a result, HHS's actions cannot stand under the APA. The County is therefore likely to succeed on the merits of its claims.

> ### i.    *HHS's unlawful withholding or freeze of grant funds is final agency action reviewable under the APA.*

The APA "sets forth the procedures by which federal agencies are accountable to the public and their actions subject to review by the courts." Under the APA, judicial review is available for "final agency action for which there is no other adequate remedy in a court." 5 U.S.C. §§ 702, 704. The APA makes clear that *agency action* includes not only agencies' affirmative acts, but also their omissions or failures to act. 5 U.S.C. § 551(13); 701(b)(2), 702 (together defining *agency action* as "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or a failure to act"). That agency action is *final* if it (1) marks the "consummation of the agency's decisionmaking process" and (2) is "one by which rights or obligations have been determined, or from which legal consequences flow." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997).

This Court and others have reviewed this question in at least two related cases governing the very same grant funding. In those cases, this Court and others concluded that the agency withholding of appropriated federal grant funding is final agency action subject to APA review. *See Nat'l Council of Nonprofits v. OMB*, No. 1:25-cv-00239 (LLA), 2025 WL 368852, at *11 (D.D.C. Feb. 3, 2023) (concluding that agency's "pause" of funding and disbursement "led to legal consequences and constituted final agency action"); *Pacito et al. v. Trump et al.*, No. 2:25-cv-255 (JNW), Order Issuing Preliminary Injunction, ECF No. 45, at 32–41 (W.D. Wa. filed Feb. 10, 2025) (that HHS's withholding of refugee resettlement program grant funds constitutes "final agency actions properly subject to APA review").

9

As those courts found, HHS's withholding has undoubtably produced legal consequences. The County will not be able to sustain the congressionally-mandated refugee resettlement program services they have offered, staff will be laid off, clinics will close their doors, and institutional knowledge will be permanently lost. Decl. at ¶¶ 23–32.

HHS's action also represents the consummation of an internal administrative decision-making process, even if opaque or *sub silentio*. That action is subject to APA review. *See, e.g.*, *Al Otro Lado, Inc. v. McAleenan*, 394 F. Supp. 3d 1168, 1206–07 (S.D. Cal. 2019) (finding that unwritten, informal agency policy limiting access to asylum was APA-reviewable); *Washington v. U.S. Dep't Homeland Sec.*, 614 F. Supp. 3d 863, 872–73 (W.D. Wash. 2020) (applying APA review to unwritten agency policy of courthouse arrests).

And, as this Court and others have found, even *temporary* withholding of appropriated federal grant funding constitutes a final agency action. *See, e.g.*, *Clean Air Council v. Pruitt*, 862 F.3d 1 (D.C. Cir. 2017) (per curiam) (holding that imposition of a temporary stay represented a final agency action, as it affected parties' rights and obligations and marked "the consummation of [the agency's] decisionmaking process").

### ii.        *Plaintiff is likely to succeed in showing that HHS acted contrary to law.*

By deciding to effectively terminate the refugee resettlement programs via cutting off appropriated federal grant funds that should flow to the County, HHS flouts an express congressional mandate laid out in the Refugee Act of 1980 and subsequent legislation. HHS thus violates the separation of powers, including the Spending Clause and the Appropriations Clause. And HHS cannot show that it satisfied the Impoundment Clause's substantive requirements. Accordingly, the County has demonstrated that it is likely to prevail on the merits of its claims. The APA requires this Court to "hold unlawful and set aside" HHS's actions, which run "contrary

to constitutional right, power, privilege, or immunity," "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," and "without observance of the procedure required by law." 5 U.S.C. §§ 706(2)(B)–(D).

First, the Constitution grants spending power to Congress, not the President. The Spending Clause of the Constitution vests Congress with the power to expend those funds for the "general welfare of the United States." U.S. Const. art. I, § 8, cl. 1. Similarly, the Appropriations Clause provides that "public finds will be spent according to the letter of the difficult judgments reached by Congress as to the common good and not according to the individual favor of Government agents." *Off. of Pers. Mgmt. v. Richmond*, 496 U.S. 414, 427–28 (1990).

Under the Appropriations Clause, Congressional appropriations thus *require* the executive branch to fulfill congressional expenditures. The executive branch cannot unilaterally amend, withhold, or cancel appropriations that Congress has duly enacted. *See Train v. City of New York*, 420 U.S. 35, 38, 44 (1975) (holding that where a statute mandated a federal agency to spend all funds, the President could not direct the agency to allot less money than the congressionally-appropriated amount). Further, where funds have already been obligated through a definite commitment, the government is legally obligated to provide those funds. *See Richmond*, 496 U.S. 414, 427–28 (1990).

In addition, courts have consistently interpreted the Spending Clause as allowing Congress to impose conditions when spending federal funds. *See Fullilove v. Klutznick*, 448 U.S. 448, 474 (1980) (reasoning that Congress may "further broad policy objectives by conditioning receipt of federal moneys upon compliance by the recipient with federal statutory and administrative directives."). The Supreme Court has since elaborated on that reasoning in *Pennhurst State School*

*& Hospital v. Halderman*, when it held that funding conditions must be established "unambiguously" before acceptance of a grant. 451 U.S. 1, 17 (1981).

Here, Congress's intent is clear. Over half a century ago, Congress created the refugee resettlement programs at issue "to provide a permanent and systematic procedure for the admission to this country of refugees of special humanitarian concern to the United States, and to provide comprehensive and uniform provisions for the effective resettlement and absorption of those refugees who are admitted." Refugee Act of 1980, Pub. L. No. 96-212, § 101(b), 94 Stat. 102.

To further those goals, Congress expressly created the Office of Refugee Resettlement ("ORR") within HHS "to fund and administer" the refugee resettlement programs. 8 U.S.C. § 1521. Congress authorized the Secretary of HHS to issue regulations to carry out the objectives of the refugee resettlement programs, including by distributing grants "to the extent of available appropriations." 8 U.S.C. § 1522(a)(9); *see generally id.* § 1522(b)–(e). Congress further mandated that ORR "shall, to the extent of available appropriations," make refugee resettlement program resources available "as quickly as possible" to achieve Congress's resettlement goals. *See* 8 U.S.C. § 1552(a)(1)(A).

Most recently, Congress has explicitly commanded the Executive Branch to promptly distribute refugee resettlement program funding to those providing the program services, including for the period for which the County has not been paid. *See, e.g.*, Consolidated Appropriations Act of 2023, Pub L. 117-328, 136 Stat. 4459, 4870–71 (Dec. 29, 2022) (appropriating over $6.3 billion for the refugee resettlement programs, to be available through September 30, 2025); Pub. L. 117-180, 136 Stat. 2114, 2123 (Sep. 30, 2022) (appropriating nearly $1.8 billion for refugee resettlement programs serving Afghan refugees, to be available through September 30, 2025).

Here, HHS has no constitutional authority to effectively cancel congressional appropriations. Because appropriations have been approved until the end of September 2025, HHS "must follow statutory mandates as long as there is appropriated money available" and cannot simply "decline to follow a statutory mandate or prohibition simply because of policy objections." *In re Aiken Cnty.*, 725 F.3d 255, 259 (D.C. Cir. 2013) (Kavanaugh, J.).

Nor can HHS justify their unlawful actions procedurally. Absent proper procedure, the Impoundment Control Act of 1974 circumscribes HHS's authority to pause obligated grant funding under the refugee resettlement programs. 2 U.S.C. §§ 681 *et seq.* The Impoundment Control Act does not permit agencies to unilaterally, categorically, immediately, and indefinitely freeze or defer disbursement of federal funds. *See Aiken Cnty.*, 725 F.3d at 261 n.1 (requiring budget authority proposed for recission to be made available until Congress acted on a recission bill) (citing 2 U.S.C. § 683). Even a *temporary* withholding or freeze of budget authority requires compliance with the procedural requirements of the Impoundment Control Act. *See* 2 U.S.C. § 684 (requiring proposed deferrals to be transmitted via a "special message" to Congress). Defendants failed entirely to follow those procedural requirements here. *See also Pacito et al. v. Trump et al.*, No. 2:25-cv-255 (JNW), Order Issuing Preliminary Injunction, ECF No. 45, at 43 n.6 (W.D. Wa. filed Feb. 10, 2025) ("The Court notes that the Refugee Funding Suspension also likely violates the Congressional Budget and Impoundment Control Act (ICA), 2 U.S.C. § 682 *et seq.*, although the parties did not address this issue.").

In addition, no executive order justifies HHS's actions. The Trump Administration has issued executive orders purporting to limit immigration. But those executive orders *cannot* support HHS's actions, as the appropriated refugee resettlement funding was mandated by Congress to benefit legally-admitted, documented individuals. And as discussed above, agency

actions taken to carry out executive orders still require agency judgment and are subject to APA review.

Finally, HHS's unlawful withholding of appropriated funds contravenes the orders granted by this Court and others. *See Nat'l Council of Nonprofits v. OMB*, No. 1:25-cv-00239 (LLA), 2025 WL 368852 (D.D.C. Feb. 3, 2023); Order Granting Motion to Enforce Temporary Restraining Order (ECF No. 96), *New York et al., v. Trump et al.*, No. 1:25-cv-00039-JJM-PAS (D.R.I. filed Feb. 10, 2025); *Pacito et al. v. Trump et al.*, No. 2:25-cv-255 (JNW), Order Issuing Preliminary Injunction, ECF No. 45, at 53–54 (W.D. Wa. filed Feb. 10, 2025).

The County has thus shown that HHS likely acts contrary to law not only by abdicating its own obligations to fund and administer the program, and by prohibiting recipients of that funding from complying with their statutory obligations.

### iii.      *Plaintiff is likely to succeed in showing that HHS acted arbitrarily and capriciously.*

HHS also acted arbitrarily and capriciously by *sub silentio* terminating the County's refugee resettlement programs, effectuated by withholding nearly $1.25M of appropriated grant funding. The APA requires that a court "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). The County has shown that such circumstances likely exist here.

An agency action is arbitrary or capricious where it is not "reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). This requires that an agency provide "a satisfactory explanation for its action . . . including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (internal quotation marks omitted). An action

is also arbitrary and capricious if the agency "failed to consider . . . important aspects of the problem" before it. *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 591 U.S. 1, 25 (2020) (quoting *Motor Vehicle Mfrs.*, 463 U.S. at 43).

Moreover, courts may judge the agency action "solely by the grounds invoked by the agency." *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947) (*Chenery II*). For this reason, a *sub silentio* change is insufficient to satisfy the APA. *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009) ("An agency may not, for example, depart from a prior policy *sub silentio* . . ."). Meaningful judicial review cannot proceed unless "the grounds upon which the administrative agency acted [are] clearly disclosed and adequately sustained." *SEC v. Chenery Corp.*, 318 U.S. 80, 94 (1943) (*Chenery I*). Accordingly, an agency action must be set aside unless its basis is "set forth with such clarity as to be understandable." *Chenery II*, 332 U.S. at 196.

HHS fails this most basic test. HHS's refusal lacks all clarity or reasoned basis. HHS fails to point to any statute or regulation authorizing its unlawful *sub silentio* termination of the programs via their funding lifeline, nor can it justify that action via any executive orders. HHS also failed to consider important aspects of the problem, including the harm to the County and reliance interests. *See Fox Television Stations, Inc.*, 566 U.S. at 515 (requiring "a more detailed justification . . . when [the agency's] prior policy has engendered serious reliance interests that must be taken into account"). Indeed, HHS *could not* have considered harm or reliance interests, as there is no evidence that HHS considered *anything* before taking this unlawful action.

Here, despite months and millions of dollars of unreleased federal grant funding, and an attempt by the County to get clarity from agency officials, HHS has failed to provide any reasoned

explanation for its decision to cut off the refugee resettlement programs at issue.[10] Instead, the County learned of the news from USCRI, who informed them about ORR's refusal to reimburse appropriated funding. Decl. at ¶¶ 16, 18–20. Neither the County nor USCRI received any advance notice of the withholding of federal funding, which has been effective since the new administration. This *sub silentio* action alone is arbitrary and capricious. *See, e.g.*, *Fox Television Stations, Inc.*, 556 U.S. at 515; *Amerijit Int'l v. Pistole*, 753 F.3d 1343, 1350 (D.C. Cir. 2014) ("[C]onclusory statements will not do; an agency's statement must be one of *reasoning*.").

Given this silence, HHS has also offered no explanation suggesting that it has complied with the payment provisions of the agency's own regulations. *See* 45 C.F.R. § 75.305(b)(1). Without explanation, HHS's departure from its own regulations independently violates the APA and is arbitrary and capricious.

Nor has HHS pointed to *any* statute or regulation that lawfully permits HHS to persist in its *sub silentio* cancellation of the programs. As stated above, no Executive Order could satisfy the requirements for legal authority under the APA. Even if any Order did, all Executive Orders concerning immigration do not apply to the appropriated refugee resettlement funding mandated by Congress to benefit legally-admitted, documented individuals.

Given the *sub silentio* nature of HHS's action, HHS has failed to demonstrate *any* kind of reasoned decisionmaking regarding important aspects of the problem. Those aspects include the irreparable harms that their actions have had on the County and the populations the County serves. Those harms include irreparable damage to the County's ability to manage its budget, its

---

[10] The federal grant regulations do allow for certain withholding or suspension of payments but only upon a showing of cause. 45 C.F.R. § 75.371. HHS has failed to show cause for its extreme withholding, so their actions are unsupported by this regulation.

employees, its reputation, and the legally-documented, admitted individuals that the County serves through its Refugee Medical Screening Program. Nor has HHS demonstrated any reasoned decisionmaking concerning the harms that will result to the County's residents more broadly.

HHS has also failed to provide any reasons that consider the County's understandable reliance on both the millions of federal grant funds at stake and the refugee resettlement programs enabled by those grants. Those reliance interests include the County's budgetary reliance on the grants, which were determined months ago and cannot be easily altered; the reliance of the many County staff on promise of employment through the fiscal year; and the reliance of the community at large, including the vulnerable individuals who depend on the County's Refugee Medical Screening Program to facilitate their transition to their new lives here.

Finally, HHS has stated to Judge AliKhan of this Court that other refugee resettlement programs and grants have continued. HHS's statements—made only after prompting by this Court—suggest that *only recipients in Texas* have been arbitrarily and capriciously denied their funds. The lack of explanation for HHS's unlawful targeting of the refugee resettlement programs in Texas and the County, as opposed to other entities, is arbitrary and capricious under the APA.

In short, HHS has not and cannot articulate any reasoned basis for *sub silentio* cancellation of the County's refugee resettlement program, effectuated by refusing to provide appropriated federal grants that should flow to the County. HHS has thus acted arbitrarily and capriciously in violation of the APA.

**B. The County will suffer immediate, irreparable injury if HHS is not restrained from unlawfully cutting off the refugee resettlement programs and appropriated funding.**

To obtain a temporary restraining order, plaintiffs must show irreparable harm absent the order. To constitute irreparable harm, the D.C. Circuit has held plaintiffs must show that the injury satisfies two factors. The injury must be

(1)     "certain and great," "actual and not theoretical," and so imminent "that there is a 'clear and present' need for equitable relief," *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006) (quoting *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985); and

(2)     "beyond remediation," meaning that "[t]he possibility [of] adequate compensatory or other corrective relief . . . at a later date . . . weighs heavily against a claim of irreparable harm." *Chaplaincy of Full Gospel Churches*, 454 F.3d at 297 (quoting *Wis. Gas Co.*, 758 F.2d at 674.

Longstanding precedent makes clear that "lo[sing] out on federal funds" is "a sufficiently concrete and imminent injury." *Dep't of Com. v. New York*, 588 U.S. 752, 767 (2019). That harm is particularly irreparable when that loss has "perceptibly impaired" the plaintiff's programs. *Fair Emp. Council of Greater Wash., Inc. v. BMC Mktg. Corp.*, 28 F.3d 1268, 1276 (D.C. Cir. 1994) (quoting *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982)). Similarly, the courts have repeatedly recognized that injunctive relief is warranted when the federal government's actions make an organization's activities more difficult and "directly conflict with the organization's mission." *Nat'l Treasury Emps. Union v. United States*, 101 F.3d 1423, 1430 (D.C. Cir. 1996).

For that reason, this Court and others have recently heard related cases and found irreparable harm when agency defendants withheld or froze federal funding—including the refugee resettlement program grant funding at stake here. This Court and others have recognized that the withholding led to reductions in programs and staff layoffs that deprive participants of critical support. *See Nat'l Council of Nonprofits v. OMB*, No. 1:25-cv-00239 (LLA), 2025 WL 368852, at *11 (D.D.C. Feb. 3, 2023); *AIDS Vaccine Avoc. Coal. v. U.S. Dep't of State*, No. CV 25-00400, 2025 WL 485324 (D.D.C. Feb. 13, 2025) (granting TRO where agencies' refusal to distribute foreign assistance funds forced program reductions and shutdowns, as well as employee furloughs and layoffs, constituting irreparable harm); *Pacito et al. v. Trump et al.*, No. 2:25-cv-255 (JNW), Order Issuing Preliminary Injunction, ECF No. 45, at 53–54 (W.D. Wa. filed Feb. 10,

2025) (determining that HHS's withholding of refugee resettlement program grant funds warranted a TRO because organizational plaintiffs would have to "lay off [staff], cancel obligations, and halt essential refugee services").

Similarly, immediate injunctive relief is necessary to prevent the County from suffering severe and irreparable harm to the Refugee Medical Screening Program and mission. First, HHS's blockade of the refugee resettlement program grants has already harmed the County's ability to staff its program, leaving nineteen positions unfulfilled. Decl. ¶ 25. As a result of this forced understaffing, the eligible individuals who participate in the Refugee Medical Screening Program have been deprived of essential medical services, thus increasing the risk to the community at large. *Id.* "[T]here can be no do-over and no redress" for the deprivations already occurred. *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 9 (D.C. Cir. 2016).

HHS's actions have forced the County to plan an inevitable shutdown. Were the County to continue with its programs, it would have to cover over $6M in expenses over the period which should be covered by its federal grant funding. Decl. ¶ 26.

Of the Refugee Medical Screening Program's remaining 37 staff members, many if not most or all will have to be laid off due to HHS's unlawful withholding of appropriated funds. *Id.* ¶ 27. There is tangible and irreparable human tragedy resulting from these layoffs and losses. These staff cuts will also cause irreversible harm to the County's ability to provide essential services in the future, even if the funding were unfrozen. Specialized staff shortages are difficult to reverse; hiring takes months to years due to a need for language skills, cultural competency, and refugee healthcare expertise. *Id. See, e.g.*, *TikTok Inc. v. Trump*, 490 F. Supp. 3d 73, 83–85 (D.D.C. 2020) (finding that inability to "recruit and retain employees" constitutes irreparable harm). Absent

relief, refilling those vacancies will be "virtually impossible." *Nat'l Council of Nonprofits*, 2025 WL 368842, at *13, 25.

The County also maintains two physical clinic locations with leases paid for by the congressionally-appropriated funding. These leases run through April 30, 2025, and August 31, 2025—both of which are threatened by HHS's unlawful actions and set to potentially close. Decl. ¶ 28. Without physical clinics, the County cannot provide the medical services mandated by Congress. In short, these harms prevent the County from fulfilling its responsibilities under the refugee resettlement program act established by Congress.

The shutdown of the Refugee Medical Screening Program will have lasting public-health consequences. For example, individuals will not receive the communicable-disease screening, parasitic-infection testing, and lead-level testing necessary for population health. *Id.* ¶ 29–30. That will result in higher rates of undiagnosed infectious diseases and create a higher likelihood of community spread of illnesses like tuberculosis and hepatitis B. *Id.* ¶ 30. These legally-admitted individuals will face increased emergency room visits and uncompensated hospital care, driving up healthcare costs and straining county hospitals. *Id.* The increased potential for disease outbreaks endangers both the refugee population and the broader community. *Id.*

*See, e.g.*, *Doran v. Salem Inn, Inc.* 422 U.S. 922, 932 (1975) (determining that "a substantial loss of business" constitutes irreparable harm); *Whitman-Walker Clinic, Inc. v. U.S. Dep't of Health & Human Services*, 485 F. Supp. 3d 1, 56 (D.D.C. 2020) (finding irreparable harm where agency action would lead to plaintiff health clinic "patients' deferring care and arriving with worsened conditions," thus "strain[ing the plaintiff's] resources," "increase[ing] costs," and "mak[ing] it harder for [plaintiff's] health care providers to treat the patients").

The County has seen that HHS's actions have seriously eroded trust and confidence within the communities with whom it is engaged. *Id.* ¶ 32. Again, the County has engaged with these communities to fulfill Congress's objectives of welcoming individuals who are lawfully admitted to the United States by statute. Now, individuals may no longer be able to depend on critical assistance when they need it most, a factor the court in *National Council of Nonprofits* recognized as irreparable harm. *See* 2025 WL 368852 at *13 (recognizing irreparable harm where "patients . . . that rely on their services may be denied care when it is most needed"). That damage is lasting and irreparable. Once disrupted, these programs cannot simply be switched back on; it is uncertain whether the County could re-establish trust with participants and bring them back into these programs is far from certain. *Id.* ¶ 32.

Finally, HHS's unlawful actions have dealt an irreparable blow to the County's mission of supporting and protecting the public health of its residents. HHS's actions—and the resulting shutdown, loss of critical staff and clinic space, and end of a decades-long program supporting public health—thus clearly "perceptibly impair[] [the County's] programs" and "directly conflict with the [County's] mission." *League of Women Voters of United States v. Newby*, 838 F.3d 1, 8 (D.C. Cir. 2016) (internal quotations and citations omitted).

For decades, the County has administered this program, which requires justifiable reliance on grant funding that the federal government approved. But HHS's unlawful actions have devastating and irreparable effects. Even if HHS fulfills its obligations and provides access to the funds at some unknown future time, the County and its mission will have been irreparably harmed, and its Refugee Medical Screening Program will have been dealt a fatal blow. That harm will continue until  the refugee resettlement programs, and the essential funding, is restored on a guaranteed basis.

**C. The balance of equities and the public interest favors the County.**

Finally, the balance of equity and the public interest also require that this Court grant injunctive relief to the County. First, the injunctive relief will result in no harm to HHS, or any other interested party, because the unlawful withholding is against the public interest. "It is well established that the Government 'cannot suffer harm from an injunction that merely ends an unlawful practice.'" *C.G.B. v. Wolf*, 464 F. Supp. 3d 174, 218 (D.D.C. 2020) (quoting *Open Cmtys. All. v. Carson*, 286 F. Supp. 3d 148, 179 (D.D.C. 2017)). In addition, "[t]here is generally no public interest in the perpetuation of lawful agency action." *Carson*, 286 F. Supp. 3d at 179. By contrast, "there is a substantial public interest in having government agencies abide by the federal laws that govern their existence and operations." *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) (quotations and citation omitted).

Here, HHS has decided to effectively terminate the refugee resettlement program by cutting off its funding. This action runs counter to statutory authority and contravenes Congress's express directive and power of the purse. Because there is a substantial public interest in HHS abiding by federal laws, this factor favors the County.

Congress has already determined that the refugee resettlement program is in the public interest. As Congress has maintained for over half a decade through continued appropriations, it is in the public interest to "provide comprehensive and uniform provisions for the effective resettlement and absorption of those refugees who are admitted." Refugee Act of 1980 Pub. L. 96-212, title I, § 101, 94 Stat. 102 (March 17, 1980). The County's program thus benefits eligible individuals by providing them with necessary medical care, and benefits the taxpayer and County at large by protecting widespread public health. Injunctive order protecting the County's refugee resettlement program funding is likewise in the public interest.

22

HHS has already determined that the County is entitled to the funding at stake by approving USCRI's contract and work plans. HHS thus cannot be injured simply by fulfilling existing congressional mandates, including processing payments for work that they have already approved in scope. In contrast, the County has demonstrated that it will suffer imminent consequences absent injunctive relief, and those effects would filter down to families and individuals who rely on the County's services.

Finally, the County does not seek nationwide relief for all entities impacted by HHS's unlawful actions related to the refugee resettlement programs. (Again, HHS has suggested that only entities in Texas have been arbitrarily, capriciously, and unlawfully cut off). Nevertheless, any decision by this Court would be limited to remedying the specific harm experienced by the County because of HHS's actions. Injunctive relief by this Court would thus be limited in scope, which further bolsters the County's showing of the balance of equities and the public interest.

## CONCLUSION

Defendants have effectively *sub silentio* terminated the County's refugee resettlement program by unlawfully cutting off federal grant funding appropriated by Congress. Their decision is contrary to the Constitution, beyond the scope of executive power, and arbitrary and capricious. Accordingly, their actions violate the APA. Because this decision will immediately cause irreparable harm to the County, this Court should grant immediate provisional relief enjoining Defendants' illegal action. The County further requests that this Court order that Defendants fulfill its obligations per congressional mandate, including the release of federal grant funds to the County approximating nearly $1.25 million as of April 7, 2025.

DATED:  April 8, 2025

Respectfully submitted,


**CHRISTIAN D. MENEFEE**
HARRIS COUNTY ATTORNEY

**JONATHAN G.C. FOMBONNE**
DEPUTY COUNTY ATTORNEY AND FIRST
ASSISTANT

**TIFFANY BINGHAM**
MANAGING COUNSEL,
AFFIRMATIVE & SPECIAL LITIGATION


*/s/ Nina L.M. Oishi*

**JONATHAN G.C. FOMBONNE**
Deputy County Attorney and First Assistant
Texas State Bar No. 24102702
D.D.C. Bar ID: TX0090
jonathan.fombonne@harriscountytx.gov

**TIFFANY BINGHAM**
Managing Counsel
Texas State Bar No. 24012287
D.D.C. Bar ID: TX0087
tiffany.bingham@harriscountytx.gov

**ELEANOR MATHESON**
Assistant County Attorney
Texas State Bar No. 24131490
D.D.C. Bar ID: TX0086
eleanor.matheson@harriscountytx.gov
C : (832) 712-3827

**NINA L.M. OISHI**
Assistant County Attorney
Texas State Bar No. 24142250

24

Case 1:25-cv-01058-LLA    Document 7-1    Filed 04/08/25    Page 25 of 26

D.D.C. Bar ID: TX0085
nina.oishi@harriscountytx.gov
C: (832) 596-4809

**ATTORNEYS FOR PLAINTIFF
HARRIS COUNTY**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and accurate copy of the foregoing document was filed electronically on April 8, 2025, with the Clerk of the Court for the U.S. District of Columbia by using the CM/ECF system, causing electronic service upon all counsel of record.

*/s/ Nina L.M. Oishi*

Nina L.M. Oishi