IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **HARRIS COUNTY, TEXAS,**  *Plaintiff,*  v.  **U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES ("HHS"),**  *and*  **ROBERT F. KENNEDY, JR., SECRETARY OF HHS, IN HIS OFFICAL CAPACITY,**  *Defendants.* | Civ. No. 1:25-cv-01058  **DECLARATION OF DR. ERICKA BROWN IN SUPPORT OF PLAINTIFF HARRIS COUNTY'S MOTION FOR TEMPORARY RESTRAINING ORDER** |

### DECLARATION OF DR. ERICKA BROWN
### DIRECTOR OF COMMUNITY HEALTH AND WELLNESS DIVISION FOR HARRIS COUNTY PUBLIC HEALTH

I, Dr. Ericka Brown, hereby declare and state as follows:

1. I am the Director of the Community Health and Wellness Division for Harris County Public Health. I make this declaration in support of *Harris County v. HHS et al.*, Civ. No. 1:25-cv01058 (D.D.C.). Except as otherwise stated, I have personal knowledge of the matters set forth herein and can and will testify thereto if called upon to do so.

2. I have held my current position with Harris County ("the County") since December 2021. In this role, I am responsible for the strategy and operations of all clinical services at Harris County Public Health ("HCPH"). Among other things, I am responsible for overseeing Harris County's Refugee Medical Screening Program ("the Program"), which is solely funded by funds

appropriated by Congress for refugee resettlement programs. Through the Program, the County provides essential, congressionally-mandated medical services to over 11,000 eligible individuals per year.

3. The Program was founded in 1980 and has served as a trusted provider of medical care for resettled refugees in Harris County for over 40 years. The Program is one of the largest in Texas.

4. The Program provides essential medical screenings and health evaluations; federally-required vaccinations; laboratory testing and infectious disease screenings (including for tuberculosis, hepatitis B, parasitic infections); mental health screenings and referrals for trauma-related care; and health education and transition to primary care providers to ensure continuity of care. These services are necessary both to fulfill the requirements set by federal law for new arrivals' integration into the community, but also to protect population-wide health.

5. The Program serves populations that Congress has specifically designated to benefit from this funding. Those individuals are legally-documented and admitted to the country, and include refugees, victims of human trafficking, Cuban and Haitian Entrants, and those on special immigrant visas. Nearly half of the populations served are from Cuba, with others from countries like the Democratic Republic of Congo, Afghanistan, and Syria.

6. The Program is entirely funded by appropriated refugee resettlement program grant funding received by the County, under a contract between HHS's Office of Refugee Resettlement ("ORR") and the United States Committee for Refugees and Immigrants ("USCRI"), which serves as the medical replacement designee across Texas.

7. Over the years, the Program has helped tens of thousands of individuals and families receive the medical treatments necessary to not only adjust to their new home in the United States but also thrive as legal residents, often becoming citizens.

8. Most recently, in October 2024, the County agreed to accept $10,520,427.30 of funding authorized by Congress for the refugee resettlement programs through the fiscal year, to the end of September 2025, as distributed by USCRI.

### *The County's Federal Grant Funding at Issue*

9. Prior to January 29, 2025, the County's federal grant had been fully functional. The County received our appropriated federal grant funds for Program expenses through November 2024.

10. The County thus proceeded with seeking the release of its appropriated federal grant funds using normal procedures.

11. On January 29, 2025, the County informed USCRI of its December 2024 expenses ($1,195,991.28). HHS only released these federal grant funds on or around March 21, 2025.

12. On February 5, 2025, the County informed USCRI of its January 2025 expenses ($701,407.03). On March 21, HHS released only the federal grant funds for the period through January 19, 2025 ($429,161.07). To date, HHS has not released the federal grant funds for the period from January 20, 2025 onwards ($271,049.09).

13. On March 6, 2025, the County informed USCRI of its February 2025 expenses ($505,914.81). To date, HHS has not released these federal grant funds.

14. On April 4, 2025, the County informed USCRI of its March 2025 expenses ($472,260.78). To date, HHS has not released these federal grant funds.

15. In total, nearly $1.25 million of federal grant funding appropriated for the County's refugee resettlement program remains outstanding and unreleased by HHS.

16. On February 12, 2025, Harris County Public Health received an email from Jessica Montour, the Texas State Health Refugee Coordinator at USCRI. The email informed the County that, to their knowledge, USCRI and Catholic Charities, Diocese of Fort Worth, Inc. ("CCFW") were the only entities nationally that had yet to receive the congressionally-appropriated refugee resettlement program funding.

17. To confirm that assurance, on March 5, 2025, Harris County Public Health Interim Executive Director Leah Barton emailed HHS Office of Intergovernmental Affairs employee Greg Hunt, cc'ing me. In our email, we sought "help securing payment for our refugee health services program." In that email, the County informed HHS that it had not received its funds via USCRI for the County's December 2024 and January 2025 expenses. The County stated that it understood the issue to stem from HHS's actions, "because USCRI's funds are frozen by ORR." On March 20, 2025, over two weeks later, HHS responded "Received." HHS then rescinded that email that same day and sent another email confirming receipt and stating, "I'll get started on your request."

18. On March 10, 2025, I received a letter from USCRI President and CEO Eskinder Negash. The letter stated that "[d]ue to delayed reimbursement of funds since January 21, 2025, USCRI is forced to suspend [its refugee resettlement program] services effective March 14, 2025." USCRI explained that "[t]his suspension is caused by the lack of timely reimbursements from ORR."

19. USCRI's letter also informed HCPH of a February 25, 2025 letter that USCRI President and CEO Eskinder Negash sent to ORR leadership seeking information about the unreleased federal grant funding. USCRI's letter additionally informed ORR that eligible

individuals, including those served by the Program, would "suffer irreparable and in some instances life threatening consequences due to ORR's failure to provide funding."

20. In addition, USCRI's March 10, 2025 letter attached an FAQ sheet. In the FAQ sheet, USCRI explained that the suspension "was necessitated by the failure of ORR to reimburse USCRI for outstanding invoices, despite repeated and continuous efforts by USCRI to seek such payments." USCRI explained that the suspension of the refugee resettlement programs "will continue until USCRI receives payments on its outstanding claims to ORR."

21. On March 21, 2025, HCPH received an email from Ms. Montour at USCRI, informing the County that ORR had released funds for all expenses incurred through January 19, 2025. HCPH has since received those funds from USCRI ($1,195,991.28 for December 2024 and $429,161.07 for January 1–19, 2025).

22. Nevertheless, our Program expenses for the remainder of January 2025, and all of February and March 2025 remain outstanding at nearly $1.25M. In addition, if County continues the Program at current levels until the end of the grant period in September 2025, the Program will incur an estimated additional $4.9M. In total, the County faces over $6M in federal grant money withheld by Congress.

*Impact on the County's Refugee Medical Screening Program and the Populations Served*

23. First, the Program is entirely funded by the refugee resettlement program funds administered by ORR, for a total of over $10.5M for the fiscal year. As the County awaits its frozen and withheld $1.25 million in federal grant funding, without any notice as to when funds will be released, the County will need to shut down the Program. Staff will be laid off, clinics will close their doors, and institutional knowledge will be permanently lost.

24. As stated above, the County faces over $6M uncovered additional expenses over the period which should be covered by its federal grant fund. Without intervention, County funds will be depleted, leading to an unavoidable shutdown.

25. HHS's withholding and freeze has already harmed the County's ability to staff its program. Due to the funding uncertainty caused by HHS's actions, nineteen (19) positions are unfilled, creating service delays. Over 3,000 refugees are currently waiting for services. At current, already-impacted staffing levels, it would take until December 2025 to complete these remaining screenings.

26. But given HHS's withholding, the County cannot even sustain its current, understaffed levels of service. Within days, on April 10, the County will be forced to consider how to address the over $6M in additional expenses owed and how soon it must end Program operations if HHS continues to unlawfully withhold funding. Under any potential contingency plan, services will be slashed, staff will be laid off, individuals will go without essential medical treatment, and resources will be depleted from other sources to address the shortfall.

27. Most of the remaining 37 staff members in the Program will have to be laid off due to HHS's unlawful withholding of appropriated funds. These staff cuts will cause irreversible damage to the Program. Specialized staff shortages are difficult to reverse, as hiring takes months to years due to language skills, cultural competency, and refugee healthcare expertise.

28. The County also maintains two physical clinic locations with leases paid for by the congressionally-appropriated funding. These leases run through the period of funding obligated by HHS (April 30, 2025, and August 31, 2025). Now both are threatened by HHS's unlawful actions and set to potentially close. Without physical clinics, the County cannot provide the medical services mandated by Congress.

29. In addition, the community has already been, and will continue to be, irreparably harmed by HHS's actions. The County's Refugee Medical Screening Program serves over 3,000 patients per month from eligible populations by providing essential health screenings, immunizations, and connections to primary care. That includes 35,000 immunizations per year. As Congress has recognized, those services are fundamental to the well-being of a population with extremely limited resources. In the absence of funding, those 3,000-plus patients would lose their medical care through the Program.

30. Disruption of these essential services would also have far-reaching public-health consequences for the broader community. For example, individuals will not receive the communicable-disease screening, parasitic-infection testing, and lead-level testing necessary for population health. That will result in higher rates of undiagnosed infectious diseases and create a higher likelihood of community spread of illnesses like tuberculosis and hepatitis B. These legally-admitted individuals will face increased emergency room visits and uncompensated hospital care, driving up healthcare costs and straining county hospitals. Finally, the potential for disease outbreaks endangers both the refugee population and the broader community.

31. Without funding, the County also cannot satisfy its other congressionally-mandated responsibilities to aid individuals' integration into Texas communities. Refugees who cannot complete medical screenings are unable to apply for permanent residency, leaving them in legal limbo. This creates a systemic backlog, preventing families from achieving legal stability and complete resettlement.

32. Finally, the County has seen that HHS's actions have seriously eroded trust and confidence within the communities with whom it is engaged. That damage is lasting and irreparable. Once disrupted, these programs cannot simply be switched back on; it is uncertain

whether the County could re-establish trust with participants and bring them back into these programs is far from certain.

33.    Pursuant to 28 U.S.C. § 1746, I hereby declare under penalty of perjury that the foregoing is true and accurate.

Executed on __4/8__, 2025.

*[signature]*
Dr. Ericka Brown